### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

—————————————————————
MICHAEL J. HOLT,

      **Plaintiff,**

      **v.**

RAYTHEON TECHNOLOGIES
CORPORATION; RAYTHEON NON-
BARGAINING RETIREMENT PLAN;
RAYTHEON COMPANY PENSION PLAN
FOR SALARIED EMPLOYEES; and
KELLY LAPPIN, ADMINISTRATOR,

      **Defendants.**
—————————————————————

) ) ) ) ) ) ) ) ) ) ) ) ) ) )

**Civil Action No.
20-11244-FDS**

### MEMORANDUM AND ORDER ON
### CROSS-MOTIONS FOR SUMMARY JUDGMENT
### AND PLAINTIFF'S MOTION TO STRIKE

**SAYLOR, C.J.**

This action arises under the Employee Retirement Income Security Act, 29 U.S.C. § 1001

("ERISA"). Plaintiff Michael Holt asserts a claim for equitable relief under § 502(a)(3) of

ERISA (Count 1), a benefit-denial claim under § 502(a)(1)(B) (Count 2), and a claim for

attorneys' fees and costs under § 502(g) (Count 3) against defendants Raytheon Technologies

Corporation, Raytheon Non-Bargaining Retirement Plan, Raytheon Company Pension Plan for

Salaried Employees, and Kelly Lappin.

The parties have cross-moved for summary judgment. Plaintiff has also moved to strike

certain screenshots taken from Raytheon's pension-system database.

The dispute at the center of this lawsuit is whether plaintiff received a lump-sum

distribution of his retirement benefit of $30,000 in 1995 while working at Texas Instruments,

whose defense and electronics division was acquired by Raytheon.  The written records from that period consist, in their entirety, of two screenshots suggesting that the amount was paid.  There are no records of any request for, or election to take, a lump-sum payout; no bank records, from either side, indicating that the amount was paid; and no evidence that plaintiff's wife executed a waiver of her interest in the retirement benefit.  The Raytheon Benefit Appeals Committee concluded that plaintiff received the lump-sum distribution, and therefore he did not receive credit for his time at TI in the calculation of his monthly retirement benefit.

This case also involves a somewhat odd set of circumstances that affects the scope of this Court's review.  The relevant plan provides that the plan administrator may delegate its discretionary authority, including to a committee.  The plan also establishes the Benefit Appeals Committee to review denied claims.  But the middle step is missing:  there is no actual, express delegation of the administrator's discretionary authority to that committee.  The Court therefore may not apply a deferential standard to the committee's decision.

In any event, for the reasons set forth below, the Court will remand the matter to the plan administrator for further proceedings.  Accordingly, and for the following reasons, the motions for summary judgment will be denied, the motion to strike will be denied as moot, and the matter will be remanded to the plan administrator for further review.

I.      **Background**

   A.      **Factual Background**

The following facts are as set forth in the record and are undisputed except as noted.[1]

---

[1] In defendants' responses to plaintiff's statement of material facts, defendants apparently do not include responses for facts that are admitted.  (*See* Defs. Resp. SMF).

1.      **The Parties**

Michael J. Holt is a retiree who formerly worked for a division of Raytheon Technologies Corporation.  (Holt Aff. ¶ 10).  He is married to Genetta Holt.  (*Id.* at ¶ 4).

Raytheon Technologies Corporation ("Raytheon") is a corporation engaged principally in the business of aerospace and defense technology.  Raytheon Non-Bargaining Retirement Plan ("Non-Bargaining Plan") and Raytheon Company Pension Plan for Salaried Employees ("Salaried Plan") are two plans administered by Raytheon.[2]

2.      **Holt's Employment History**

a.      **Texas Instruments and Lockheed Martin**

Holt was a Business Development Director for Texas Instruments, Inc. ("TI"), from June 8, 1981, through April 1, 1995.  (Holt Aff. ¶ 14).  He was fully vested in the Texas Instruments Employees Pension Plan ("TI Plan") when he left TI in 1995.  (*Id.* at ¶ 18; *see* Fowler Aff. ¶ 1). After leaving TI, he worked as a Business Development Director for Lockheed Martin Corporation.  (Holt Aff. ¶ 13).

b.      **Raytheon Job Offer**

Holt accepted an offer of employment from Raytheon Missile Systems on June 28, 1999. (*Id.* at ¶ 26).  Ronald Morgan, who served as a Business Development Vice President, interviewed and hired him.  (Morgan Aff. ¶ 6).

Upon hiring, Holt was classified as a "Raytheon rehiring employee" because TI's defense and electronics division had been acquired by Raytheon in 1997, and his employment at TI had terminated less than five years earlier.  (Holt Aff. ¶¶ 22, 26; *see* Pl. Ex. H, 1).  According to Holt,

---

[2] Defendant Kelly P. Lappin's relationship to this case is unclear.  Neither party identified Lappin in their statements of material fact.  The complaint alleges that Lappin is an administrator of both plans, which defendants assert is inaccurate.  (Defs. Mem. at 6 n.3).  In any event, plaintiff is not moving for summary judgment against Lappin.

an HR representative at Raytheon informed him that "rejoining with Raytheon provided for credited service for pension benefits" and that Raytheon would "bridge" his 13 years of service with TI.  (Holt Aff. ¶ 22).  He says that he accepted the offer at Raytheon, despite a reduction in salary, based on that representation.  (*Id.* at ¶¶ 22-27).  He further contends that he would not have otherwise accepted the offer.  (*Id.* at ¶ 27).

Defendants dispute that such a representation was made.  They further contend that Morgan, who attended the meeting with HR, does not attest that Raytheon or its HR representative in fact told Holt that he would receive 13 years of pension service credit.

Because there are numerous qualifiers in Morgan's affidavit and the parties characterize it differently, the Court includes an excerpt here:

> [A] Human Resources representative and I met with Mr. Holt to summarize the impressions of the interview team regarding Mr. Holt's "fit" with Raytheon and specifically, the JSOW [Joint Standoff Weapon] Program.
>
> The Human Resources representative was in the meeting because that representative was specifically designated as the subject matter expert ("SME") by Raytheon with the responsibility to address all issues related to employment . . . .
>
> The representative had the opportunity to highlight unique benefits that Raytheon employment would provide that another potential employer, or a current employer, could not offer to the candidate.
>
> For example, the representative would have known that Mr. Holt's resume and employment records showed Texas Instruments had employed him from 1981 to 1995.
>
> The representative was obligated to further explain that since the time between Mr. Holt's resignation from Texas Instruments in 1995 to his rejoining Raytheon in 1999 was fewer than five years, Raytheon policy would designate Mr. Holt's acceptance of Raytheon employment as "rehiring" into Raytheon.  The representative could also explain to Mr. Holt that the "rehiring" designation would provide a strong incentive for accepting Raytheon's offer since the same Raytheon policy would combine his previous 13 years of service with Texas Instruments with his future years with Raytheon for the purposes of calculating pension benefits.

4

. . .

(Morgan Aff. ¶¶ 18-22).

Defendants contend that Morgan's affidavit does not state that he has any familiarity with the terms of either plan, particularly what those terms required with respect to service credit. They further object that Holt did not present those facts during the ERISA plan appeal process and also did not allege them in the complaint. (Defs. Ex. C, 33; *see* Complaint ¶¶ 9-36).[3]

### c.   Raytheon Retirement

Holt received service awards from Raytheon on each of his 15, 20, 25, and 30-year anniversaries, which were calculated based on his combined service at TI and Raytheon. (Holt Aff. ¶ 28). He retired from his position with Raytheon on January 31, 2020. (*Id.* at ¶ 10).

### 3.   Holt's Current Pension Benefits

Holt currently receives a monthly pension benefit of approximately $4,054 per month. (Defs. Ex. E; Fowler Aff. ¶ 3). That benefit is based on service with Raytheon from June 28, 1999, through January 31, 2020. (*See id.*; Defs. Ex. G, 9). He is currently a participant in the Non-Bargaining Plan, although he disputes whether that is the appropriate plan under which he should receive his pension benefit. (Fowler Aff. ¶ 1).

### 4.   RTIS Plan and Salaried Plan

In July 1997, Raytheon acquired the assets of TI Defense Systems and Electronics through a subsidiary, Raytheon TI Systems, for $2.95 billion. (Pl. Ex. D, 7). On September 30, 1997, TI transferred pension assets from the TI Plan to Raytheon totaling $305,102,650, and Raytheon assumed the actuarial liabilities associated with employees transferred to it. (*Id.*). Raytheon then established a defined benefit plan, the Raytheon TI Systems Employees Pension

---

[3] Defendants further contend that this issue was raised for the first time on summary judgment.

Plan ("RTIS Plan"), for the transferred and former TI Defense employees.  (Pl. Ex. J, 11, 14, 37).
The RTIS Plan was amended and restated effective July 11, 1997.  (Pl. Ex. E, 5).[4]  Raytheon also
took over the electronic records relating to the TI Plan's administration.  (Fowler Dep. 61).

Effective January 1, 2001, the RTIS Plan merged into, and became part of, the Salaried
Plan sponsored by Raytheon.  (Pl. Ex. F, 7).[5]  The Salaried Plan contains generally applicable
provisions, as well as specific provisions in Exhibit E – Raytheon TI Systems Employees
Pension Plan.  (*Id.* at 203).

### a.    Cash Outs

Eligible participants of the Salaried Plan may receive pension benefits based on the
length of time the employee works in "Covered Employment."  (Pl. Ex. F, 211-12).  The plan
also provides for cashouts, and states that "[i]f a fully vested Participant receives his entire
Accrued Benefit as a lump sum, he shall lose all prior Benefit Accrual Service credit."  (*Id.*).

### b.    Plan Administrator

The Salaried Plan gives discretionary authority to the Plan Administrator (that is,
Raytheon) to construe the terms of the plan and to determine eligibility and entitlement to
benefits.  (*See id.* at 32, 41-42).  Specifically, the Plan provides as follows:

> **7.1 Administrative Duties and Powers of the Administrator.**  The general
> administration of the Plan shall be the responsibility of the Administrator.  The
> Administrator shall be the named fiduciary for the purposes of ERISA.  The
> Administrator shall have the authority, in its sole discretion, to construe the terms
> of the Plan and to make determinations as to eligibility for benefits and as to other
> issues within the duties of the Administrator described below, including all

---

[4] Plaintiff contends that although the RTIS Plan has an amended and restated date of July 11, 1997, the unsigned signature page has an execution date of 2002. (Pl. Ex. E, 103).  Defendants respond that the RTIS Plan was established on July 11, 1997.

[5] Plaintiff also disputes the year that the RTIS Plan merged into the Salaried Plan, again pointing to the unsigned signature page of the RTIS Plan with an execution date of 2002. (Pl. Ex. E, 103).  Fowler testified that the RTIS Plan "merged into the salary plan in 2002." (Fowler Dep. 27).  However, the preamble clearly provides that "[e]ffective January 1, 2001," the RTIS Plan was merged into the Salaried Plan, and the RTIS Plan "shall cease to exist as [a] separate plan[] after December 31, 2000." (Pl. Ex. F, 7).

questions of fact and law.  All such determinations of the Administrator shall be conclusive and binding on all persons.  The Administrator shall conduct the general administration of the Plan in accordance with the Plan and shall have the discretionary power and authority to carry out that function including the following powers and authority:

     (a) To determine questions of eligibility of Participants and the entitlement to Benefits of Participants, Former Participants, Beneficiaries, Contingent Annuitants and all other persons. . . .

     (c) To interpret and construe the terms of the Plan.

     (d) To conduct claims procedures as provided in Section 7.11.

     (e) To delegate any power or duty to any other person or persons including a Committee appointed pursuant to Section 7.3.

(*Id.* at 32).

Section 7.3 states that the "Senior Vice President of Human Resources of Raytheon may, but need not, appoint an administrative Committee consisting of one or more members appointed by the Senior Vice President of Human Resources of Raytheon and holding office during his or her pleasure to function as the Administrator."  (*Id.* at 33).  And Section 7.11(c) provides that the members of the Benefit Appeals Committee "shall be appointed by the Senior Vice President of Human Resources of Raytheon."  (*Id.* at 34).

The Salaried Plan further provides that the Administrator is a named fiduciary with "exclusive authority and discretion to control and manage the operation and administration of the Plan . . . .  The Administrator shall have full discretionary authority to determine eligibility for benefits and to construe the terms of the Plan."  (*Id.* at 41-42).  "Such named fiduciaries . . . and any person designated by a named fiduciary to carry out fiduciary responsibilities under the Plan, shall be fiduciaries. . . ."  (*Id.*).  All fiduciary responsibilities not allocated to the Trustee or certain other investment fiduciaries are allocated to the Administrator.  (*Id.* at 42).

### c.   Raytheon Benefits Center

The Salaried Plan also provides that participants may submit benefit claims to the Administrator through the Raytheon Benefits Center.  (*Id.* at 34).  After reviewing a claim, the Administrator "shall notify the claimant in writing whether the claim is upheld or denied. . . ." (*Id.*).

### d.   Benefit Appeals Committee

If the Administrator denies a claim, in whole or in part, a claimant may file a request for review, which will be performed by the Benefit Appeals Committee.  (*Id.*).  The Committee's members are appointed by the Senior Vice President of Human Resources of Raytheon.  (*Id.*).  A claimant will be notified within 60 days whether his claim was upheld or denied by the Committee.  (*Id.*).

### e.   Summary Plan Description

The Summary Plan Description for the Salaried Plan provides as follows:

> Raytheon's Benefit Appeals Committee has complete and final discretionary authority to decide appeals (requests for review) of claim denials . . . .  The plan intends that any decision of the Benefit Appeals Committee concerning any appeals under the provisions of this plan shall be final and conclusive, and shall be upheld in any court review unless that decision was so arbitrary and capricious as to be an abuse of discretion.

(Defs. Ex. H, 17).

### 5.   Non-Bargaining Plan

The Non-Bargaining Plan is a defined benefit retirement plan sponsored and administered by Raytheon.  (*See* Defs. Ex. A, 17).  The Non-Bargaining Plan became effective on December 18, 1997, in connection with an acquisition of assets from Hughes Electronics Corporation. (*Id.*).  It covers certain employees who transferred to Raytheon at the time of the acquisition, as well as certain employees subsequently hired by Raytheon and otherwise not excluded from

participation.

As noted, Holt is a current participant in the Non-Bargaining Plan.  (Fowler Aff. ¶ 1).
However, the parties dispute whether the Non-Bargaining Plan properly applies to him.
Defendants contend that participants in the Non-Bargaining Plan include individuals such as Holt
who started at Raytheon in a business unit formerly owned by Hughes before that unit went onto
Raytheon payroll at the end of 1999.  (Fowler Dep. 27-29).  He was hired on June 28, 1999, by
Raytheon Missile Systems, which is one of the identified "Companies" to which the Non-
Bargaining Plan applies.  (Morgan Aff. ¶ 25).  Thus, according to defendants, he was "hired into
a Hughes unit" and properly became a participant in the Non-Bargaining Plan.  (Fowler Dep.
27).[6]

Plaintiff responds that defendants' Rule 30(b)(6) deponent, Scott Fowler, Senior Manager
of Compensation and Benefits at Raytheon, testified that the Non-Bargaining Plan is only for
former employees of Hughes Aircraft Company or Hughes Electronics Corporation.[7]  Thus,
according to plaintiff, the Non-Bargaining Plan does not apply to him because he never worked
for either.  (Holt Aff. ¶ 15).[8]

---

[6] Plaintiff disputes that fact, contending that Raytheon induced him to accept that position based on a
promise that he would be bridged into the pension plan for former TI employees, not the Non-Bargaining Plan.
(Holt. Aff. ¶ 22).

[7] Defendants do not dispute that Holt never worked for Hughes, but contend that it is irrelevant because it
was not presented to the Benefit Appeals Committee at the time of its claim determination, did not appear in the
administrative record, and is not probative of whether or not he received the 1995 Lump Sum.  (Defs. Resp. SMF at
2-3).  They also allege that he never contested that he was a participant in the Non-Bargaining Plan during the
ERISA plan appeal process.

Defendants further object on the basis that Fowler was never designated to give testimony concerning the
issue of whether Holt was a proper participant in the Non-Bargaining Plan.  They also object based on the Court's
Order on Scope of Discovery, which limited discovery to the issue of whether Holt received the 1995 Lump Sum
and relinquished his rights.  (Defs. Resp. SMF at 6).

[8] Fowler testified as follows:

    Q:  Did Mr. Holt ever work for Hughes Electronics?

6.      **The Disputed 1995 Lump-Sum Payment**

The critical issue in this case is whether TI paid Holt a lump-sum payment of $30,000.16 to cash out his pension benefits in 1995.  Holt states that TI "never paid [him] $30,000.16 to waive pension rights."  (Holt Aff. ¶ 47).  His wife, Genetta Holt, also states that she never received such a payment.  (Genetta Holt Aff. ¶ 8).  Holt also contends that he never executed a document waiving pension rights under the TI Plan.  (Holt Aff. ¶ 48).  Genetta Holt likewise has not executed such a document.  (Genetta Holt Aff. ¶ 7).[9]

Defendants acknowledge that they are not in possession of any documents signed by Holt at the time of the alleged 1995 Lump Sum payment.  In particular, they do not have copies of any application for a lump-sum payment or any written waivers.  However, they deny that Holt and his wife never signed such documentation and contend that TI likely would not have provided paper documentation concerning the alleged payment.  (Geron Aff. ¶ 13; Fowler Dep. 19).  They also dispute that he never received the 1995 Lump Sum payment based on certain records in Raytheon's pension database.  According to defendants, his receipt of the 1995 Lump Sum

---

A:  He worked for Raytheon Hughes division.
. . .

Q:  Are the only people in the non-bargaining plan Hughes employees?

A:  Correct.

Q:  When you say Hughes employees, are those people that worked for Hughes when it was part of General Motors?

A:  It was anybody who worked for Hughes.  And then even when Raytheon bought them, anybody who was in a Hughes business unit until they went on Raytheon payroll went into a Hughes pension plan.  They didn't go on a Raytheon payroll until the end of '99, that's in the pension plan.

(Fowler Dep. 28-29).

   [9] Defendants object to Genetta Holt's statements because Holt did not submit that information during the ERISA plan appeal process or in the complaint.

10

payment was reflected in historical information provided by the TI Plan in 1997 and then subsequently maintained in Raytheon's pension database.  (Raytheon Answers to Interrog. at 9-10; Fowler Dep. 61).

Defendants have also supplied screenshots of Raytheon's pension database that purport to show such a payment.  The screenshots were obtained from Conduent, a third-party administrative and recordkeeping service provider with respect to the Non-Bargaining Plan and Salaried Plan.  (Geron Aff. ¶ 2).

The first screenshot, Exhibit E, is taken from Raytheon's pension-system database.   It purports to show that Holt received the 1995 Lump Sum payment.  Fowler has highlighted the entry reflecting a $30,000.16 payment with a blue arrow.  Alan Geron, a Client Services Manager with Conduent, has supplied an affidavit that states:

> The screenshot attached at [Exhibit] E to the [Fowler Affidavit] is a screenshot of the DB7 pension table as it appeared in 2020 showing payment to plaintiff Michael Holt.  The payment information in the screenshot would have come from converted data provided by Texas Instruments in 1997, and its appearance in the DB7 pension table, as depicted in the screenshot, looks the way it would be expected to look for such a situation.

(*Id.* at ¶ 15).

Exhibit E shows the following:

Michael Holt – Pension System Screenshot



(Defs. Ex. E, 1).

The second series of screenshots, Exhibit F, is also taken from Raytheon's pension-system database. Exhibit F "reflect[s] how the pension system database appeared as of September 7, 2002, which is as far back in time as the pension system database may be accessed." (Fowler Aff. ¶ 8). Geron's affidavit provides further context:

> The screenshots attached at [Exhibit] F to the [Fowler Affidavit] are screenshots of the Pension Manager as it appeared in 2002, again showing payment to plaintiff Michael Holt. The payment information in the screenshots would have come from converted data provided by Texas Instruments in 1997, and its appearance in the Pension Manager, as depicted in the screenshots, looks how it would have been expected to look in 2002 for such a situation.

(Geron Aff. ¶¶ 15-16). Exhibit F lists Holt's "original hire date" as June 8, 1981, which is the date he was hired by TI. (Defs. Ex. F, 1). It also includes an entry showing a payment of $30,000.16 to him on May 1, 1995:



Holt objects to the screenshots on the basis that the database is unreliable, unauthenticated, and constitutes hearsay.  He further contends that notwithstanding those screenshots, he never received $30,000.16 from TI.  (Holt Aff. ¶ 47).  He contends that he has no records from any bank account or investment account, or any tax records, from the relevant period.

### 7.   Claim Denial and Appeal

In 2017, Holt inquired about his years of credited service for purposes of calculating his pension.  (Defs. Ex. C, 3).  Specifically, he contacted the Raytheon Benefits Center in September 2017, and stated that he had been rehired by Raytheon, and therefore his official hiring date for pension purposes was August 5, 1985.  (Holt Aff. ¶ 34).[10]  He was informed that his retirement benefit would be calculated based on his period of employment with Raytheon and that he would not be receiving a retirement benefit based on his period of employment with TI.  (Defs. Ex. C,

---

[10] It is unclear from the record why Holt claims an official hiring date of August 5, 1985, for pension purposes, considering that he worked for TI from 1981 to 1995.  His affidavit states, "[t]he August 5, 1985, Service Date on my Raytheon Employee Fact Sheet showed an adjustment for the four-year period that I started working at Lockheed Martin from the spring of 1995 until I rehired into Raytheon on June 28, 1999."  (Holt Aff. ¶ 33).

3-4).  On January 17, 2018, and again on July 26, 2018, the Raytheon Benefits Center informed

him that, according to its records, he had received a lump-sum payment of his TI benefits.  (*Id.*).

In a letter dated October 2, 2018, the Raytheon Benefits Center informed Holt that his

claim for additional retirement benefits for the period prior to June 28, 1999, was denied because

he had received the 1995 Lump Sum payment upon termination of his employment at TI.  (*Id.* at

11; Pl. Ex. H).  In a telephone call between the Raytheon Benefits Center and Holt on December

5, 2018, Holt reported that TI had informed him that all records were transferred to Raytheon in

1997. (Defs. Ex. C, 5).

On May 8, 2019, Holt administratively appealed the October 2, 2018 claim determination

to the Benefit Appeals Committee.  (*Id.* at 33; Holt Aff. ¶ 40).  He attached a document he

received from the IRS stating it no longer had records relating to his 1995 taxes.  (Defs. Ex. C,

53-58).  He also attached an itemized statement of earnings from the Social Security

Administration from 1995 to 1996 that showed that he earned $33,767.88 from TI.  (*Id.* at 59-

62).  In his appeal letter, he stated in relevant part:

> Essentially, the only issue of disagreement between the RBC and myself is the
> RBC's interpretation of some alleged "information," presumably in my personnel
> file, which "implies" that I have already received compensation (by "RTIS" or
> "Texas Instruments") for my thirteen-plus years of service at TI and therefore, my
> years of service at TI are not eligible to be included in my future Raytheon
> pension benefit calculations.

(*Id.* at 39).

Holt argued that the Social Security Administration statement proved that he did not

receive the 1995 Lump Sum payment because the payment was not reflected as part of his 1995

earnings from TI.  (*Id.* at 38).  He also wrote that he had "thoroughly examined" all his records

and found no evidence that he "received a lump sum payment of any kind, let alone a pension

payout, from Texas Instruments in 1995."  (*Id.* at 37).

14

On July 12, 2019, the Benefit Appeals Committee denied Holt's appeal by letter.  (Defs.

Ex. D, 1).  The position of the Committee was that the information submitted by Holt in support

of his appeal did not provide sufficient proof that he never received the 1995 Lump Sum

payment from TI.  (*Id.*).  The July 12, 2019 letter further explained:

> In accordance with Article II, Section 2.5-E(d) of the Plan, "if a fully vested
> Participant receives his entire Accrued Benefit as a lump sum, he shall lose all
> prior Benefit Accrual Service credit."  Since our database records reflect that you
> received a lump sum from TI on May 1, 1995 in the amount of $30,000.16, no
> further pension is payable to you under this Plan or for the period of service
> during which you were an employee of TI.
>
> The committee reviewed the supporting information that accompanied your
> appeal and found that it did not provide proof that you never received a lump sum
> from TI.  Specifically, a pension payment is not reported to Social Security as
> wages and therefore, a lump sum payment from a qualified pension plan would
> not appear as Social Security wages on a statement.

(*Id.*).[11]

The parties dispute exactly what information was presented and available to the Benefit

Appeals Committee at the time it made its decision on Holt's appeal.  At a minimum, there does

not appear to be a dispute that Raytheon's summary of appeal was presented to the Committee as

part of the administrative record.  (Fowler Dep. 71).  Among other things, it stated:  "[o]ur

records indicate that [Holt] received a lump sum payout from Texas Instruments in the amount of

$30,000.16 on May 1, 1995.  This amount is reflected on the payment table in the pension

database."  (Defs. Ex. C, 3).[12]

However, Fowler acknowledged that the actual screenshots from Raytheon's pension

---

[11] Plaintiff disputes the conclusion that the 1995 Lump Sum payment would not appear as Social Security wages, contending that this would require expert testimony.  (Pl. Resp. SMF at 16-17).

[12] Plaintiff disputes the reliability of that information, contending that the underlying database is unreliable, unauthenticated, and constitutes hearsay.  He further contends that the database belongs to a third party, Conduent, and that he never received $30,000.16 from TI.  (Holt Aff. ¶ 47).

database were not presented to the Committee at any point.  (Fowler Dep. 70-73).  He further testified that the screenshots were not created until November 10, 2020, after this lawsuit began. (*Id.* at 46).[13]

### B.    Procedural Background

On June 29, 2020, plaintiff brought this action against defendants.  Count 1 seeks declaratory and equitable relief pursuant to 29 U.S.C. § 1132(a)(3) ("ERISA § 502(a)(3)"). Count 2 alleges a benefit-denial claim under 29 U.S.C. § 1132(a)(1)(B) ("ERISA § 502(a)(1)(B)").  Count 3 seeks an award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) ("ERISA § 502(g)").

The parties have cross-moved for summary judgment on all counts.  Plaintiff has also moved to strike certain screenshots taken from Raytheon's pension-system database.

## II.    Legal Standard

In an ERISA benefit-denial case, summary judgment operates as "a vehicle for deciding the issue."  *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005).  Unlike the usual summary-judgment standard, "the non-moving party is not entitled to . . . inferences in its favor."  *Id.*  Instead, the district court "sits more as an appellate tribunal" and "evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary."  *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002).  That determination is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  When the plan

---

[13] On December 29, 2020, defendants requested that Holt produce all documents concerning his position that he did not receive the 1995 Lump Sum payment from TI in 1995.  (Defs. Ex. 2, 2).  In response, he did not produce any documents different from the ones previously submitted during the ERISA plan appeals process.  (*See* Defs. Ex. 3, 2).

administrator has been granted such discretion, its decision must be upheld unless it is arbitrary, capricious, or an abuse of discretion. *See Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan*, 705 F.3d 58, 61 (1st Cir. 2013).

## III.   Analysis

### A.   Benefit-Denial Claim under § 502(a)(1)(B)

Plaintiff first alleges that he is entitled to benefits wrongfully denied to him pursuant to § 502(a)(1)(B), which provides, in relevant part, that a participant or beneficiary may bring a civil action to "recover benefits due to him under the terms of his plan."

#### 1.   Standard of Review

The Court must first determine whether the plan provides discretionary authority to determine eligibility for benefits such that defendants' decisions are entitled to deference. *See Firestone Tire & Rubber Co.*, 489 U.S. at 115. That authority "must be expressly provided for." *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue Inc.*, 813 F.3d 420, 427 (1st Cir. 2016) (citing *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 584 (1st Cir. 1993)). Even though the plan is not required to contain any "precise words," it must offer "more than subtle inferences" to secure discretionary review. *Gross v. Sun Life Assurance Co.*, 734 F.3d 1, 15-16 (1st Cir. 2013); *see also Stephanie C.*, 813 F.3d at 428 ("[A] grant of discretionary decisionmaking authority in an ERISA plan must be couched in terms that unambiguously indicate that the claims administrator has discretion to construe the terms of the plan and determine whether benefits are due in particular instances." (emphasis omitted)). The inquiry is ultimately one of notice: "[T]he critical question is whether the plan gives the employee adequate notice that the plan administrator is to make a judgment within the confines of pre-set standards, or if it has the latitude to shape the application, interpretation, and content of the rules in each case." *Stephanie C.*, 813 F.3d at 427 (quoting *Gross*, 734 F.3d at 14).

17

Two questions must be answered to determine the proper standard of review:  first, "whether the Plan expressly grants discretionary authority to the plan administrator to determine a claimant's eligibility"; and second, "whether the administrator has properly delegated that discretionary authority to the Benefit [Appeals] Committee." *Terry v. Bayer Corp.*, 145 F.3d 28, 36 (1st Cir. 1998).

Here, Section 7.1 of the Salaried Plan provides that Raytheon, the Administrator, "shall be the named fiduciary" and "shall have the authority, in its sole discretion, to construe the terms of the Plan and to make determinations as to eligibility for benefits as to other issues within the duties of the Administrator."  (Pl. Ex. F, 32).  It further states that Raytheon

> shall conduct the general administration of the Plan in accordance with the Plan and shall have the discretionary power and authority to carry out that function including the following powers and authority:
>
> > (a) To determine questions of eligibility of Participants and the entitlement to Benefits of Participants, Former Participants, Beneficiaries, Contingent Annuitants and all other persons. . . .
> >
> > (c) To interpret and construe the terms of the Plan.
> >
> > (d) To conduct claims procedures as provided in Section 7.11.
> >
> > (e) To delegate any power or duty to any other person or persons including a Committee appointed pursuant to Section 7.3.

(*Id.*).  Section 8.10 confirms that Raytheon is a named fiduciary with "exclusive authority and discretion to control and manage the operation and administration of the Plan . . . [and Raytheon] shall have full discretionary authority to determine eligibility for benefits and to construe the terms of the Plan."  (*Id.* at 41-42).  Taken together, that language provides a clear grant of discretionary authority.  *See Terry*, 145 F.3d at 37 (finding requisite discretion where plan "specifically allocates to the Company the right to find necessary facts, determine eligibility for benefits, and interpret the terms of the Plan").

The second question is one of delegation. "ERISA allows named fiduciaries to delegate responsibilities [by] expressly provid[ing] for procedures . . . for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan." *Id.* (internal citations omitted) (quoting 29 U.S.C. § 1105(c)(1)(B)) (alterations in original).

Here, Section 7.1 permits Raytheon to "delegate any power or duty to any other person or persons including a Committee appointed pursuant to Section 7.3" by the Senior Vice President of Human Resources of Raytheon.  (Pl. Ex. F, 32).  However, even if Raytheon has the power to delegate as a theoretical matter, it must expressly delegate its discretionary authority to the Benefit Appeals Committee for that committee to be entitled to a deferential standard of review.

Defendants broadly assert, without citation to the Salaried Plan, that Raytheon's "discretionary authority to decide appeals of denied benefit claims under the Plan's benefit claims appeals procedures . . . is delegated and allocated to the Raytheon Benefit Appeals Committee."  (Defs. Mem. at 7).  Yet there is no such language in the Salaried Plan; if there were, defendants would surely have quoted it.  Instead, they cite to several different provisions in the Plan.  Section 7.11 sets forth the Salaried Plan's claims procedure.  A participant may file a claim with the Administrator via the Raytheon Benefits Center.  (Pl. Ex. F, 34).  "Within ninety . . . days after the filing of such a claim, the Administrator shall notify the claimant in writing whether the claim is upheld or denied in whole or in part . . . ."  (*Id.*).  Next, as relevant here, a participant may file a written request for review if the claim has been denied in whole or in part.  That procedure specifies that

> [t]he request for a review will be forwarded to and the review will be performed by a benefit appeals committee ("Benefit Appeals Committee"), whose members shall be appointed by the Senior Vice President of Human Resources of Raytheon; provided, however, any member of the Benefit Appeals Committee

> may not be the person who made the initial adverse benefits determination nor a
> subordinate of such person.  Within sixty (60) days after the filing of such a
> request for review, the Benefit Appeals Committee shall notify the claimant in
> writing whether, upon review, the claim was upheld or denied in whole or in
> part . . . .  All decisions on original claims shall be made by the Administrator (or
> by an authorized representative of the Administrator) and all decisions on requests
> for a review of a denied claim shall be made by the Benefit Appeals Committee.

(*Id.* at 34-35).

However, the Salaried Plan does not expressly delegate the Administrator's discretionary authority to the Benefit Appeals Committee.  It does not give the Committee authority to make "reasonable" decisions, which the First Circuit has found to be "an inherently discretionary function."  *Terry*, 145 F.3d at 38.  It also does not provide the Committee with authority to "conduct a complete and adequate review before making a decision upholding the denial of a claimant's benefit."  *Id.*

By its terms, the Salaried Plan *does* grant the Benefit Appeals Committee the power to make "all decisions on requests for a review of a denied claim."  (Pl. Ex. F, 35).  However, that is not enough; the First Circuit has noted that "[t]he power to decide does not necessarily imply the existence of discretion."  *Rodriguez-Lopez v. Triple-S Vida, Inc.*, 850 F.3d 14, 22 (1st Cir. 2017); *see also Stephanie C.,* 813 F.3d at 428.  It would appear, therefore, that discretionary authority has not been expressly delegated to the Benefit Appeals Committee.

That conclusion is bolstered by comparing the language of other plans that triggered deferential review under the arbitrary, capricious, or abuse of discretion standard.  *See, e.g.*, *Earl T. Sydney & Sydney Sheet Metal, Inc. v. Sheet Metal Workers' Pension Fund*, 2017 WL 507210, at *8 (D. Mass. Feb. 7, 2017) ("Appeals Committee has 'the sole and absolute power, authority and discretion to determine' the 'application and interpretation of the Plan Document'"); *O'Shea through O'Shea v. UPS Ret. Plan*, 837 F.3d 67, 73 n.9 (1st Cir. 2016) ("Committee 'shall have the exclusive right to interpret the Plan and decide any matters arising in the administration and

operation of the Plan' in a 'conclusive and binding' capacity"); *Gross v. Fed. Exp. Corp. Long Term Disability Plan*, 707 F. Supp. 2d 67, 71 (D. Mass. 2010) ("LTD Plan grants the Committee discretion to determine eligibility for benefits and to construe the terms of the Plan").  As those cases illustrate, "[c]larity of language is crucial to accomplishing a grant of discretionary authority under an ERISA plan."  *Stephanie C.*, 813 F.3d at 428.

Defendants nevertheless contend that the summary plan description provides the requisite delegation of discretionary authority.  The SPD states as follows:

> Raytheon's Benefit Appeals Committee has complete and final discretionary authority to decide appeals (requests for review) of claim denials . . . .  The plan intends that any decision of the Benefit Appeals Committee concerning any appeals under the provisions of this plan shall be final and conclusive, and shall be upheld in any court review unless that decision was so arbitrary and capricious as to be an abuse of discretion.

(Defs. Ex. H, 17).  However, the Supreme Court has held that "summary documents, important as they are, provide communication with beneficiaries *about* the plan, but . . . their statements do not themselves constitute the *terms* of the plan for purposes of § 502(a)(1)(B)."  *CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011) (emphasis in original).[14]  The First Circuit has not addressed the issue of whether discretionary authority can be "effected only through the Plan itself," *see Rodriguez-Lopez*, 850 F.3d at 21 n.4, but other courts confronted with the issue have found it prudent to apply *de novo* review.  *See Barbu v. Life Ins. Co. of North Am.*, 987 F. Supp. 2d 281, 283 (E.D.N.Y. 2013) (applying *de novo* review in light of *Amara* where defendant did not demonstrate that summary document "was integrated into the plan and contained terms of the plan") (emphasis omitted); *Durham v. Prudential Ins. Co. of Am.*, 890 F. Supp. 2d 390, 396

---

[14] In an earlier opinion, this Court considered the language of a summary plan description in determining whether the plan at issue had delegated its discretion to an outside administrator.  *See Tebo v. Sedgwick Claims Mgmt. Servs., Inc.*, 848 F. Supp. 2d 39, 50-51 (D. Mass. 2012).  In light of the Supreme Court's decision in *Amara*, that decision may have given undue weight to the terms of the SPD.

(S.D.N.Y. 2012) (stating that "SPD cannot confer discretion" and therefore "the appropriate standard of review is *de novo*"); *Ringwald v. Prudential Ins. Co. of Am.*, 609 F.3d 946, 949-50 (8th Cir. 2010) (remanding to conduct *de novo* review because discretion-granting language was only found in summary plan description).[15]   Here, defendants do not contend that the Salaried Plan incorporates the summary plan description by reference.   Thus, the summary plan description does not, by itself, delegate discretion to the Committee.

Because the Salaried Plan must "unambiguously indicate" a grant of discretionary authority to the Committee, the Court is not convinced that it has done so here.   *See Stephanie C.*, 813 F.3d at 428.   "[I]nferences from the circumstances . . . [are] insufficient to prove delegation of discretionary authority."   *Rodriguez-Abreu*, 986 F.2d at 584.   In all, the Salaried Plan does not expressly delegate Raytheon's discretionary authority to the Committee.   Mindful that the "default rule favors *de novo* review," the Court will undertake that review here. *Stephanie C.*, 813 F.3d at 427.

To perform *de novo* review, the Court must "independently weigh the facts and opinions in the administrative record to determine whether the claimant has met his burden" of showing, by a preponderance of the evidence, coverage of claims under the applicable plan.   *See Richards v. Hewlett-Packard Corp.*, 592 F.3d 232, 239 (1st Cir. 2010); *Stephanie v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 2016 WL 3636978, at *2 (D. Mass. June 30, 2016).   The Court "stand[s] in the shoes of the administrator to determine whether the administrative decision was correct."   *Richards*, 592 F.3d at 239 (internal quotation marks and ellipses omitted).   "[N]o

---

[15] Defendants also point to *Koehler v. Aetna Health Inc.*, 683 F.3d 182, 189 (5th Cir. 2012), which holds that "*Cigna* does not disturb our prior holdings that . . . ambiguous plan language be given a meaning as close as possible to what is said in the plan summary").   However, the next sentence of defendants' brief states that the Salaried Plan is "consistent and clear" on the delegation of discretionary authority.   (Defs. Reply at 6).   They do not assert that the Salaried Plan is ambiguous, rendering *Koehler* inapplicable.

deference [is given] to the administrator's opinions or conclusions." *Gross*, 734 F.3d at 17.[16]

### 2.  Analysis

At first glance, this case presents a relatively simple issue:  whether plaintiff received $30,000 as a lump-sum payout in 1995, which would preclude him from receiving any further pension benefits arising out of his service at TI.  Plaintiff contends that he never received that payment; defendants maintain that their database records show that he did.  In resolving that factual dispute, the stakes are high, at least from plaintiff's perspective—according to plaintiff, his 13 years of lost pension credit from TI result in an underpayment of his benefit by Raytheon of approximately $3,000 per month.

The substantial passage of time between 1995 and 2018 complicates matters considerably.  Defendants contend that the only records they possess are two entries in their pension-system database, reflected in the two screenshots.  They contend that they do not possess any paperwork concerning plaintiff's request for, or election to take, a lump-sum payment; the granting of that request; or the execution of any spousal waiver of her right to benefits.  Nor do they possess any financial records reflecting the issuance or cashing of a check or a wire transfer of funds.  Plaintiff contends that he has sought records from the IRS, the Social Security Administration, and TI, without success.

The Court's task is further complicated by the scope of review.  "ERISA benefit-denial cases typically are adjudicated on the record compiled before the plan administrator." *Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc*., 852 F.3d 105, 110 (1st Cir. 2017) (quoting *Denmark v. Liberty Life Assur. Co.*, 566 F.3d 1, 10 (1st Cir. 2009)).  This is true even

---

[16] Because the appropriate standard of review is *de novo*, the Court need not reach plaintiff's argument that *Metro. Life Ins. Co. v. Glenn* requires it to consider financial conflicts "in determining whether the plan administrator has abused its discretion in denying benefits."  554 U.S. 105, 108 (2008).

when the appropriate standard of review is *de novo*.  *See Orndorf*, 404 F.3d at 519-20.

The administrative record here is only 62 pages, including several duplicate documents. There is a short "appeal summary" drafted by a Raytheon representative; the Raytheon Benefits Center's denial letter; excerpts from the Salaried Plan; and an appeal letter from Holt.  The appeal letter includes an email from a Raytheon HR representative that says "Our records show that the participant took a Lump Sum payment of his RTIS benefit 5/1/1995 in the amount of $30,000.16."  (Defs. Ex. C, 51).  The appeal letter also includes two letters from the IRS confirming that no records were available, and an itemized statement of earnings from the Social Security Administration for Holt's 1995 wages.  For reasons that are not clear, the screenshots from the Raytheon pension-system database were not part of the administrative record.

Based on that limited paper record, it is difficult for the Court to make a decision *de novo* as to the merits of the claim.  That review is essentially based on a single sentence in the record: "[O]ur database records reflect that you received a lump sum from TI on May 1, 1995 in the amount of $30,000.16."  (Defs. Ex. D, 1).  It is certainly possible that the universe of evidence will never change, and that the dispute will have to be resolved on the current record. Nonetheless, there appear to be at least three avenues of inquiry that do not appear to have been explored, or at least not explored as fully as possible:  the credibility of plaintiff and his wife; the precise nature of the screenshots; and the absence of any evidence of spousal consent or waiver.

To illustrate the Court's concerns, consider the following five potential scenarios:

1.  Plaintiff, in complicity with his wife, is lying; he received the $30,000 payout and is attempting to defraud Raytheon in order to receive a larger retirement benefit.

2.  Plaintiff is lying, but his wife is not; he received the $30,000 payout and spent it without telling her.

24

3.  Plaintiff is mistaken; he received the $30,000 payout, but has forgotten that he did so.

4.  Raytheon mailed plaintiff a check for $30,000, but he never received it, and therefore it was never cashed.

5.  Raytheon mailed plaintiff a check for $30,000, but someone stole it, forged his endorsement, and cashed it.

First, the truth or falsity of several of those scenarios hinges to a large degree on the credibility of the plaintiff (and his wife).  It appears that the Committee never met plaintiff or his wife, but instead relied on a letter he wrote that essentially denied that he received a lump-sum benefit.  In a court of law, the requirement that credibility be assessed through a face-to-face encounter is considered a basic principle of fairness and due process, so much so that it is enshrined in the Bill of Rights.  While the Committee is not a court, it would be nonetheless highly preferable to permit plaintiff to have an opportunity to present his case in person, so that the factfinder can assess his credibility directly.

Second, and as noted, the screenshots themselves were not considered by the Committee.  They appear to be accounting records, not banking records, and therefore it is unclear whether they show an actual transfer of cash to plaintiff (or anyone else).  It would surely be preferable for the Committee to receive as full an explanation as possible as to the nature of the entries on those documents and their possible implications.  It is of course possible that there is no new information to be gained, but the Committee would be better served by reviewing the actual screenshots, rather than a summary of their contents, and understanding in full what they display.

Third, and perhaps most importantly, there is no evidence of spousal consent.  Under § 1055(a)(1) of ERISA, the default pension option available to married participants of a qualified pension plan is the "Qualified Joint and Survivor Annuity" ("QJSA").  Under the terms of that

option, amortized benefits are paid directly to the eligible retiree and, upon his or her death, one

half of the remaining benefits are paid to the surviving spouse for the duration of his or her life.

Plan participants can elect to choose other available benefit options under a plan, but certain

elections require spousal consent.  To select a lump-sum payment in lieu of a QJSA, a married

participant must submit a QJSA waiver form signed by his or her spouse and notarized by a

notary public.  *See* 29 U.S.C. § 1055(c)(2)(A).  By executing that form, the spouse consents to

waiving his or her survivor benefits in exchange for a single lump-sum payment.

> An effective waiver of a spouse's rights to benefits requires that:
>
> 1.  The spouse of the participant consents in writing to such an election;
>
> 2.  The election designates a beneficiary (or a form of benefit) that may not be changed without spousal consent (or the consent of the spouse expressly permits designations by the participant without any requirement of further consent by the spouse);
>
> 3.  The spouse's consent acknowledges the effect of the election; and
>
> 4.  The consent is witnessed by a plan representative or notary public.

29 U.S.C. § 1055(c)(2)(A); *see Gallagher v. Gallagher,* 2013 WL 752471, at *3 (D. Mass. Feb.

26, 2013).  Importantly, the "waiver of the qualified joint and survivor annuity . . . is invalid

unless it satisfies the rigorous rules in § 1055(c)."  *Rice v. Rochester Laborers' Annuity Fund*,

888 F. Supp. 494, 498 (W.D.N.Y. 1995) (quoting *Lester v. Reagan Equip. Co. Profit Sharing*

*Plan & Empl. Sav. Plan*, 1992 WL 211611, at *5 (E.D. La. Aug. 19, 1992)).

> The necessity for strict construction of an alleged "spousal waiver" was explained in

*Hagwood v. Newton*, 282 F.3d 285 (4th Cir. 2002), as follows:

> The spousal rights conferred by § 1055(a) were intended to "ensure a stream of income to surviving spouses," *Boggs*, 520 U.S. at 843, and the formalities required in § 1055(c) are included *to protect against the risks of a spouse's unwitting waiver of those rights*, *Lasche v. George W. Lasche Basic Profit Sharing Plan*, 111 F.3d 863, 867 (11th Cir.1997) (noting that formalities are necessary "to ensure a valid waiver of a spouse's retirement plan [and] are

> consistent with the legislative policy of protecting spousal rights"). ERISA's
> formalities must, therefore, be strictly enforced. In *Lasche*, for example, the court
> held that a waiver was invalid under § 1055 simply because the signatures had not
> been witnessed by a notary as required by that section.

*Hagwood*, 282 F.3d at 290 (emphasis added); *see also Sun Microsystems, Inc. v. Lema*, 2006 WL

278386, at *3 (N.D. Cal. Feb. 2, 2006) ("The 1989 designation also is likely invalid on the

ground that [the participant's spouse's] signature, waiving her spousal benefits, was not

witnessed by a Plan representative or notary public.").

Moreover, courts have held that spousal consent forms required under § 1055 are subject

to heightened scrutiny to ensure that they comply with ERISA. *See, e.g., Smart v. Gillette Co.

Long-Term Disability Plan,* 70 F.3d 173, 181 (1st Cir. 1995) (stating that "courts should

scrutinize an ostensible waiver with care in order to ensure that it reflects the purposeful

relinquishment of an employee's rights"); *Morais v. Cent. Beverage Corp. Union Emps.'

Supplemental Ret. Plan*, 167 F.3d 709, 712-13 (1st Cir. 1999).

Here, assuming the TI Plan was a defined benefit plan, § 1055 applies and a spousal

consent form should have been provided to TI before plaintiff could effectively change his

benefit form to a lump-sum payment, and before any lump-sum payment could be made. *See* 29

U.S.C. §§ 1055(b)(1)(A), (c)(2)(A). Whether or not a spousal consent form was ever executed

surely bears on whether plaintiff in fact received the lump-sum payment.[17]

There is no evidence in the administrative record whether such a waiver exists or, if it

does, whether it complies with § 1055. In this litigation—but not before the Committee—

Genetta Holt has filed an affidavit stating that she "never signed a release or waiver of pension

benefits and rights for pension benefits or rights that [her] husband, Michael Holt, earned for his

---

[17] Although plaintiff's spouse is not a party to this suit, the issue of spousal consent is nonetheless a
pertinent issue.

years of service at Texas Instruments from 1981-1995." (Genetta Holt Aff. ¶ 7). Those facts were not part of the administrative record at all, and defendants have not offered proof of such a waiver. It is entirely possible—absent proof of a spousal waiver that complies with § 1055—that the lump-sum payment was improper as to Genetta Holt's rights to receive a pension. The corresponding consequences on plaintiff's pension rights are unclear.

A somewhat similar situation was presented in *Low-Iacovino v. Benefit Plan Comm. of the Nonbargained Program of the AT&T Pension Benefit Plan*, 2017 WL 6541772, at *7 (C.D. Cal. Dec. 20, 2017), where the district court found that the plan administrator had abused its discretion in denying a surviving spouse's claim. The plan administrator had denied the plaintiff's claim because it contended that her husband had elected to receive his benefits in the form of a single-life annuity, as opposed to a joint and survivor annuity. *Id.* at *2-3. The plan administrator did not have her husband's benefit election form; it only had a "computer printout of information related to [his] pension benefits." *Id.* at *3. The court noted that spousal waivers are subject to "strict construction," and was troubled by the lack of documentation in the record. *Id.* at *4. It ultimately concluded that "[b]ased on the information in the record, it is just as likely that an error was made when inputting [the husband's] information as it is that [he] elected to waive Joint and Survivor annuity." *Id.* at *6.[18]

The apparent absence of documentation here also raises issues concerning the proper allocation of the burden of proof. Although plaintiff generally bears the burden to establish a violation of ERISA, *Terry*, 145 F.3d at 34, it may not be reasonable to require that plaintiff prove

---

[18] Defendants cite to *Beck v. Xcel Energy, Inc.*, 2020 WL 5106791 (D. Minn. Aug. 31, 2020), where a court found a pension plan's screenshot sufficiently reliable. However, the *Beck* court distinguished *Low-Iacovino* because "a signed and notarized form is required to waive the joint and survivor annuity form of benefit" and "[s]uch formalities are not required to make an election choice." *Id.* at *6.

the absence of a spousal consent or waiver. Rather, it seems more sensible to place the burden on defendants to provide evidence that an ERISA-compliant waiver occurred. *See Estate of Barton v. ADT Sec. Servs. Pension Plan*, 820 F.3d 1060, 1069 (9th Cir. 2016) (holding that "[w]here a claimant, through documentary or other objective evidence, has made a *prima facie* case that he is entitled to a pension but has no means except for information in the defendant's control to establish [his claim], the burden then shifts to the defendant to produce such information"). Any such records, if in existence, would likely be in defendants' control. Nor does it seem appropriate to excuse the lack of records because defendant acquired another company. *See id.* at 1066 ("[N]othing in ERISA [ ] supports such a Kafkaesque regime where corporate restructuring can license a plan administrator to throw up his hands and say 'not my problem'").

There is, however, one disputed issue that this Court can readily resolve, because it involves a question of law. The Committee's determination included the following legal conclusion:

> The committee reviewed the supporting information that accompanied your appeal and found that it did not provide proof that you never received a lump sum from TI. Specifically, a pension payment is not reported to Social Security as wages and therefore, a lump sum payment from a qualified pension plan would not appear as Social Security wages on a statement.

(Defs. Ex. D, 1).

This Court agrees with the Committee's determination. For Social Security purposes, wages do not include any payments from a qualified pension to an employee or that employee's beneficiary. 42 U.S.C. § 409(a)(4); 20 C.F.R. § 404.1052(a)(2); *see also* SOC. SEC. LAW &

PRAC. § 9:41 (2022).[19]  Therefore, a lump-sum payment from defendants' pension plan would not appear on an earnings statement from the Social Security Administration.  Its absence, therefore, is not evidence that plaintiff was not paid the lump-sum benefit.

In all, the factual record is inadequate for the Court to conduct "an inquiry into the totality of the circumstances [to] determine whether there has been a knowing and voluntary relinquishment of an ERISA-protected benefit."  *Smart*, 70 F.3d at 181 (citation omitted).  Under such circumstances, remand is appropriate.  "There is no question that this court has the power to remand to the claims administrator. . . ."  *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005.  Indeed, other courts have noted that "remand is appropriate where [the] decision-maker 'fails to make adequate findings or fails to provide an adequate reasoning.'"  *Id.* (quoting *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 477 (7th Cir. 1998), *abrogated on other grounds by Huss v. IBM Med. & Dental Plan*, 418 F. App'x 498, 511 (7th Cir. 2011)). Remand is also suitable "where [an] administrator's decision was faulty but it was not 'clear-cut that it was unreasonable' to deny benefits."  *Id.* at 32 (quoting *Quinn*, 161 F.3d at 478); *see also Maher v. Mass. Gen. Hosp. Long Term Disability Plan*, 665 F.3d 289, 295 (1st Cir. 2011) (ordering remand to plan administrator where court was "not confident that its analysis has fully justified its decision"); *Zarro v. Hasbro, Inc.*, 896 F. Supp. 2d 134, 144-45 (D.R.I. 2012) (refraining from ruling on motions for summary judgment until plan administrator provided further review).

The Court will therefore remand proceedings to the plan administrator "to conduct such further review and provide such further explanation and information as it sees fit, providing

---

[19] Assuming the TI Plan was a defined benefit plan, it was a qualified retirement plan; that is, it was a trust exempt from tax under sections 401 and 501(a) of the Internal Revenue Code.

[plaintiff] a fair opportunity to respond to any such supplementation of the administrative record." *Maher*, 665 F.3d at 295. The Court will retain jurisdiction over the case and stay proceedings in the interim.[20]

Finally, and as noted, plaintiff also argues that he should have been placed in the Salaried Plan, not the Non-Bargaining Plan. That determination appears to depend, at least in part, on whether he in fact received the 1995 Lump Sum payment, and therefore forfeited any future pension benefits derived from the TI Plan. (*See* Pl. Ex. F, Section 1.14-E) (defining "Former TI Employee" as "[a]ny person who is a 'Transferred Individual' as defined in the [asset purchase agreement] provided, however, that such former employee shall be considered a Former TI Employee only if assets and liabilities of the TI Plan attributable to such employee have been transferred to this Plan or the Previous plan . . . ."). Therefore, in light of the remand, the Court will not attempt to resolve that issue at this time.

### B.  Equitable-Relief Claim under § 502(a)(3)

Plaintiff also asserts a claim under ERISA § 502(a)(3), a provision that operates as a "catchall" to provide "appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996). Pursuant to § 502(a)(3), "a participant, beneficiary, or fiduciary" may sue "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to

---

[20] Plaintiff also contends that defendants violated the anti-cutback rule. Section 204(g) of ERISA provides that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan . . . ." 29 U.S.C. § 1054(g). Plaintiff's assertion of a violation of the anti-cutback rule is not mentioned in the complaint at all; indeed, it is mentioned for the first time in his briefing as a reason why he is entitled to summary judgment on his benefit-denial claim under § 502(a)(1)(B). (*See* Pls. Mem. at 13). Even assuming that it is proper to consider such a claim, it appears likely to fail. *Cf. Bonneau v. Plumbers & Pipefitters Local Union 51 Pension Trust Fund ex rel. Bolton*, 736 F.3d 33, 34 (1st Cir. 2013). It also does not appear that Raytheon's acquisition of TI Defense Systems and Electronics violated Section 208 of ERISA, which provides that "[a] pension plan may not . . . transfer its assets or liabilities to, any other plan . . . unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after . . . transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before . . . transfer (if the plan had then terminated)." 29 U.S.C. § 1058.

obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).

In *Varity Corp.*, the Supreme Court concluded that an individual may sue for breach of fiduciary duty under § 502(a)(3), ruling that § 502(a)(3)'s "'catchall' provisions act as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy."  516 U.S. at 512.  However, as the First Circuit has stated, "*Varity* circumscribes the applicability of [§ 502(a)(3)]; 'where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief . . . .'"  *LaRocca v. Borden, Inc.*, 276 F.3d 22, 28 (1st Cir.2002) (quoting *Varity*, 516 U.S. at 515).  Following *Varity*, "federal courts have uniformly concluded that, if a plaintiff can pursue benefits under the plan pursuant to [§ 502(a)(1)], there is an adequate remedy under the plan which bars a further remedy under [§ 502(a)(3)]."  *LaRocca*, 276 F.3d at 28; *see also Turner v. Fallon Cmty. Health Plan, Inc.*, 127 F.3d 196, 200 (1st Cir. 1997).

Here, in light of remand to the plan administrator, it is premature to determine plaintiff's "catchall" claim for equitable relief.  Accordingly, the Court will deny summary judgment as to Count 1 without prejudice to its renewal.

### C.    Claim for Attorneys' Fees and Costs under § 502(g)

Plaintiff also seeks attorneys' fees and costs pursuant to ERISA § 502(g)(1), which provides that "[i]n any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1).

"[E]ligibility for [an award under § 502(g)(1)] does not require that the fee-seeker be a prevailing party," but only that the "claimant show[ ] 'some degree of success on the merits.'" *Gastronomical Workers Union Local 610 & Metro. Hotel Ass'n Pension Fund v. Dorado Beach*

*Hotel Corp.*, 617 F.3d 54, 66 (1st Cir. 2010) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010)).  "The favorable result must be more than a trivial success or a purely procedural victory, but it is enough if the court can fairly call the outcome of the litigation some success on the merits without conducting a lengthy inquiry into the question whether a particular party's success was substantial or occurred on a central issue."  *Gross v. Sun Life Assur. Co. of Canada*, 763 F.3d 73, 76 (1st Cir. 2014) (internal quotation marks and citations omitted).

As relevant here, the Supreme Court in *Hardt* did not reach the issue of whether "a remand order, without more, constitutes 'some success on the merits' sufficient to make a party eligible for attorney's fees under § 1132(g)(1)."  *Hardt*, 560 U.S. at 256.  The First Circuit has also declined to adopt a bright-line position, although it found "the majority view persuasive" that "a remand to the plan administrator for review of a claimant's entitlement to benefits, even without guidance favoring an award of benefits or an actual grant of benefits, is sufficient success on the merits to establish eligibility for fees under section 1132(g)(1)."  *Gross*, 763 F.3d at 77 (citations omitted).

Here, in light of remand and in the absence of any briefing from the parties on the issue of attorneys' fees, the Court will deny summary judgment as to Count 3 without prejudice to its renewal.

###     D.     Motion to Strike

Finally, plaintiff has moved to strike the screenshots taken from Raytheon's pension-system database.  He contends that the screenshots are not properly authenticated and constitute inadmissible hearsay.  In light of the order to remand, the Court will deny the motion to strike as moot.

### IV.     Conclusion

For the foregoing reasons, the motions for summary judgment are DENIED, and the

motion to strike is DENIED as moot.  The matter will be remanded to the plan administrator for further review consistent with this opinion.

**So Ordered.**

                                        /s/ F. Dennis Saylor IV
                                        F. Dennis Saylor IV
Dated: March 31, 2022                   Chief Judge, United States District Court